# EXHIBIT E

1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (SAN JOSE DIVISION)

4

5  In re:

6  INTEGRATED PACKAGING            Case No. 07-53563
   ASSEMBLY CIRCUITS, INC.,
7                                  Chapter 11

8                                  San Jose, California
                                   November 28, 2007
9        Debtor.                   2:40 p.m.
   _____/

10

11

              TRANSCRIPT OF 341 MEETING OF CREDITORS
12

13      BEFORE NANETTE DUMAS, ATTORNEY FOR THE U.S. TRUSTEE

14
   APPEARANCES:
15
   For the U.S. Trustee:    NANETTE DUMAS, ESQ.
16

17 Responsible Individual   VICTOR BATINOVICH
   for the Debtor:
18
   Counsel for Debtor:      WILLIAM HEALY, ESQ.
19

20 Representative of        CHRISTINE MARCAL
   the IRS:
21
   Transcriber:             JO McCALL
22

23

24

25

1          P R O C E E D I N G S
2   November 28, 2007                           2:40 p.m.
3                        -oOo-
4          MS. DUMAS: Calling the meeting of creditors in
5   the case entitled <u>Integrated Packaging Assembly</u>.  This is
6   an initial meeting of creditors, and this is a Chapter 11
7   case, Case No. 07-53563.  I'm Nanette Dumas, Attorney for
8   the U.S. Trustee.  Today is November 28th.  This was a
9   meeting scheduled for 2:30.  Let the record reflect that it
10  is now approximately 2:40.
11         Will counsel for the Debtor please identify
12  himself for the record.
13         MR. HEALY: I am William Healy, H-e-a-l-y, counsel
14  for the Debtor.
15         MS. DUMAS: Okay.  And will the Debtor's
16  responsible individual please identify himself for the
17  record.
18         MR. BATINOVICH: Victor Batinovich,
19  B-a-t-i-n-o-v, as in Victor, - i-c-h.
20         MS. DUMAS: Batinovich.  Okay.  Okay. Mr.
21  Batinovich, please stand and raise your right hand, and
22  I'll swear you in.  Do you swear that the testimony that
23  you are about to give in this matter is the truth, the
24  whole truth, and nothing but the truth, under penalty of
25  perjury?

1       MR. BATINOVICH: I do.

2       MS. DUMAS: Thank you. Please be seated. Okay.

3  Now because there's been no initial debtor interview in

4  this case, we discussed off the record before we commenced

5  today, a continued date of January 9th, 2008 at 1:30 p.m.

6  At that time, I will be asking questions of you, Mr.

7  Batinovich, but for today's purposes, I'm going to first

8  invite your attorney to see if he would like to make a

9  brief statement about the case, and then we have at least

10 one creditor here who wants to ask questions and maybe one

11 or two others who either want to ask questions or just

12 listen and get some idea of where the case is going.

13      So you are invited, although not required, to

14 make a brief statement about why this case was filed, what

15 the Debtor's strategy is for getting out of Chapter 11, and

16 anything else you may want to say.

17      MR. HEALY: Okay. I will make a brief opening

18 statement to benefit all that are here. We filed the

19 bankruptcy on October 31st of this year, primarily because

20 IPAC, the short name, IPAC's landlord was proceeding to

21 enforce a writ of possession, and had that been enforced,

22 there would have been devastating consequences to IPAC.

23 IPAC's new facility up in Fremont, although leased, was

24 subject to continued build-out several days a week, you

25 know, six, seven days a week or so, and that was not going

1 to be ready for occupancy and use until at least December

2 1st was the anticipation.

3        And IPAC sought relief from the court.  We did

4 face an immediate motion for relief from stay from the

5 landlord, and November 9th, I believe, we entered into an

6 agreement with them whereby we could stay through the

7 morning of the 10th of December, at which time the sheriff

8 or the Federal Marshal, whoever it is, can come in and

9 enforce a writ of possession.

10        IPAC anticipates getting out this next few days,

11 well in compliance with that deadline.  IPAC did make a

12 rental deposit to cover whatever turns out to be the rent,

13 post-petition, and if we're there past the 3rd, we have an

14 obligation to pay some more money on the 3rd.  IPAC's Plan

15 is not really certain where it's going to go because it's a

16 little -- a little, a lot preoccupied with the impending

17 situation with its landlord, so once that's kind of

18 resolved, which it should hopefully be in the next handful

19 of days if the moves all work well, the exit out and the

20 entry in, IPAC will then turn around and really focus its

21 attention on how it deals with its future.

22        It does have a couple pieces of litigation in

23 State Court, which one is stayed; one is by the Debtor, I'm

24 not thinking very active.  Otherwise, it's business as

25 usual as far as I understand.

1            MS. DUMAS: Okay.  When you say you entered into
2   an agreement with the landlord, do you get money back if
3   you get out before December 3rd or --

4            MR. HEALY: The agreement called for us to pay --
5   the agreement we made was that we would pay essentially
6   November rent --

7            MS. DUMAS: Right.

8            MR. HEALY:  -- and make a deposit against that.
9   There's an issue of what the rent really is, and if we
10  stayed into December, then we made a second deposit against
11  December rent.

12           MS. DUMAS: Okay.

13           MR. HEALY: And, yes, there would be credit back
14  and forth and that's all.  We put the money down on
15  November 26th, and December 3rd is the other deadline date.

16           MS. DUMAS: Okay.  But at least you got the
17  breathing room that you needed in order to get out and get
18  moved into Fremont.

19           MR. HEALY: Exactly.

20           MS. DUMAS: Okay.  All right.  Well, Mr.
21  Batinovich, why don't you just briefly describe what kind
22  of business, what is IPAC; what does it do?  Is it a
23  manufacturer?  What's it all about?

24           MR. BATINOVICH: Yes.  IPAC is a manufacturer of
25  semiconductors and circuits manufacturing company.  We

1  serve a broad range of customers, including military,

2  aerospace, medical, and consumer electronics. It is a type

3  of manufacturing that's mostly done in Southeast Asia. We

4  have elected to bring some of it back over here. We have

5  operated out of this facility since 1993, and during that

6  time, many landlords changed the building.

7  There are certain conditions under which we have

8  to operate, which include, moisture, temperature, and a few

9  other conditions, and the building has gone into disarray.

10  The landlords changed. One landlord turned it over to the

11  insurance company, from which South Bay purchased the

12  building. The building is absolutely dilapidated. Water

13  is coming in through the boards, stuff like that, and our

14  desire to get the landlords to address some of these issues

15  basically got us in a position where we ended up in a

16  rather acrimonious relationship with the last landlord,

17  South Bay, and rather than address the issue, they elected

18  really to find ways to evict us. Of course, they have

19  money; we don't.

20  MR. HEALY: That's extraneous.

21  MS. DUMAS: Okay.

22  MR. BATINOVICH: So that's where we are, and then

23  after we reached an agreement that we would move, they gave

24  us three months which is an absolutely physical

25  impossibility to find a new facility, get it facilitized,

1 and get everything done in that time frame, and of course,
2 the proverbial gun was against our head, and we had no
3 choice but to agree.  And the deadline was the 31st of
4 October.
5          Even though that we took the necessary steps to
6 stop all this while we -- because we kept negotiating with
7 the landlord and they waited til the last minute and
8 wouldn't give us any answers, so we had no choice but to
9 file for bankruptcy.
10          MS. DUMAS: M-hm.
11          MR. BATINOVICH: But on the 1st of November, they
12 still brought in marshals, disrupted our operation, and
13 shut the building down.  I lost a horrendous amount of
14 product, not just my product, but my customer's product,
15 equipment that has gone haywire because we didn't go
16 through the proper procedure to shut it off.  We didn't
17 know how long that would stop.  It was absolute chaos.
18          MS. DUMAS: They brought marshals in even though
19 the bankruptcy was filed?
20          MR. BATINOVICH: Yes.  Yes.
21          MS. DUMAS: Can you get damages against them for
22 that?
23          MR. BATINOVICH: Well, we will address that issue
24 later on.
25          MR. HEALY: I researched that, and I'm a little

1 concerned about it.  The --

2          MS. DUMAS: Because it's not an individual debtor.

3          MR. HEALY: Well, I -- because everybody clearly

4 had notice, because we had sent it out to counsel.  Mr.

5 Batinovich and his State Court counsel were even noticed.

6 But I personally went down to the sheriff's office and the

7 guy was nice enough to say well, it's inefficient to

8 deliver it at 8:00 o'clock at night; why don't you fax it

9 in.  And I talked to the sheriff's office the next day, and

10 their comment was basically -- tough!

11          MR. BATINOVICH: But anyway, that is something we

12 need to address later on.

13          MR. DUMAS: Well, the sheriffs don't understand

14 the law necessarily.

15          MR. HEALY: Oh, I tried to explain it to him, but

16 their response was -- tough!

17          MS. DUMAS: Yeah, right, right.

18          MR. HEALY: And our thought was --

19          MS. DUMAS: But counsel for the landlord surely

20 understood --

21          MR. HEALY: Well, I will say that Mr. Murray

22 called me the next morning and said that it just came to

23 his attention -- this is about 11:00 o'clock or so.  Mr.

24 Batinovich was in my office, and his immediate response

25 was, what do we need to do to put you back in the building.

1          MS. DUMAS: M-hm.

2          MR. HEALY: We had sent notice out that night.

3          MR. BATINOVICH: Actually Chad was there, and I

4 tried to show him the paper and he basically told me that

5 if I don't leave, I was going to be arrested.  So I had no

6 choice.  So after that, I went down to the sheriff, and the

7 sheriff basically told me either have our attorney read the

8 law books again or replace -- asked me to replace our legal

9 representative.  That was their response.

10          MR. HEALY: Our thought was we would address that

11 issue --

12          MR. BATINOVICH: Later on.

13          MR. HEALY:  -- once IPAC got to where it really

14 needs to be, which is up in Fremont.

15          MS. DUMAS: M-hm.

16          MR. HEALY: And, Victor you also indicate the

17 money that IPAC has put up to that new landlord, there's a

18 problem with their contract.

19          MR. BATINOVICH: Right.  Because of the time

20 frame, the landlord was going to do these TI's but because

21 of the time constraints --

22          MR. HEALY: The new landlord.

23          MR. BATINOVICH:  -- yeah, because of the time

24 constraints that we had to accomplish all this and facing

25 another marshal shutdown, I had to personally hire a

1  contractor, to the tune of about $700,000 to do the

2  facilities, to work around the clock, Saturdays, Sundays,

3  nights, just to get the job done, so that South Bay

4  wouldn't lock us out.

5         It is, at best, a nightmare, you know.  In

6  addition to employing a substantial number of people, we're

7  trying to bring jobs back.  The easiest thing for me was to

8  really pack everything, ship it to Southeast Asia, like

9  everybody else is doing, but this was definitely -- makes

10 it difficult, not only for me, for us, but for the entire

11 industry.  This serves as a black mark to the entire

12 semiconductor, high tech industry.

13        MS. DUMAS: M-hm.  Yeah.

14        MR. BATINOVICH: As a matter of fact,

15 Semiconductor International Electronics News and a few

16 other ones wanted to write articles on it, and I didn't

17 want any part of it because I don't need this sort of

18 negativism.

19        MS. DUMAS: M-hm.  Yeah.  But definitely that's

20 unfortunate that, you know, the filing of the bankruptcy is

21 supposed to protect against all of these kinds of things,

22 and --

23        MR. BATINOVICH: Right.  I had no choice.

24        MS. DUMAS: It failed -- yeah, yeah.

25        MR. HEALY: It focuses more on the sheriff.  I was

1 a little surprised, because I had contacted the -- I

2 couldn't get a hold of the lead sheriff, and I talked to

3 whoever was the officer in charge, and I told him I didn't

4 like the statement that he said to Victor about do some

5 research or get a new attorney. But I told him I thought

6 they were wrong, and I suggested to them that they ought to

7 contact Mr. Murray who had a lot more cautious approach.

8 But we'll cross that -- there's a question obviously

9 whether or not they have immunity.

10          MS. DUMAS: M-hm.

11          MR. HEALY: That's my concern, whether they have

12 immunity. I don't know the answer to that.

13          MS. DUMAS: All right. Well, I guess I'll leave

14 that all up to you, but it's unfortunate because it seems

15 like the day after you filed bankruptcy, you were -- all of

16 a sudden your debts increased by a couple million dollars.

17          MS. BATINOVICH: Yes.

18          MR. HEALY: And the sad part was I was pleased

19 that they were open that late at night, the sheriff's

20 office. There were two guys right there, and I said, you

21 know, this is kind of important; it's a bankruptcy stay.

22 And he said I'll go put it right on the dispatcher's desk,

23 and he said, just so I could cover myself, he gave me the

24 fax number for the people who do the evictions. But I

25 think -- I think they decided not to stop because they had

1 a truckload of people or something, a whole staff of

2 guys -- it's 60,000 square foot building.

3          MR. BATINOVICH: They brought an army.

4          MR. HEALY: They brought their whole crew.

5          MR. BATINOVICH: They brought an army of sheriffs.

6          MR. HEALY: So I think they decided, you know,

7 we're already organized; we're coming.

8          MS. DUMAS: Hmm.

9          MR. BATINOVICH: But the appeal was issued that

10 morning around 8:30 or thereabouts.

11          MS. DUMAS: Right.  But you're telling me you

12 filed on October 31 and all this happened on November 1.

13          MR. HEALY: Right.

14          MR. BATINOVICH: Not only one sheriff, as I said,

15 a truckload full of them showed up.

16          MR. HEALY: And apparently weren't allowing the

17 employees, who were saying, you know, I've got to push

18 seven buttons to turn it off.  It was get out or get

19 handcuffs.

20          MS. DUMAS: Who's the judge in this case.

21          MR. HEALY: It's Judge Weissbrodt.

22          MS. DUMAS: Uh-huh.  And has Judge Weissbrodt

23 heard this whole story yet?

24          MR. BATINOVICH: Not yet.

25          MR. HEALY: Well, when we responded to the motion

1 for relief from stay, we threw it in our pleadings as a

2 factual scenario that the sheriff did come in and shut

3 things down, but it wasn't the focus of our motion

4 obviously, or our opposition.

5          MS. DUMAS: M-hm.

6          MR. HEALY: So he's only heard a fraction of it,

7 and I certainly don't think it was his focus at the time,

8 especially when we went outside in the hallway working out

9 a deal.

10          MS. DUMAS: Interesting. All right. Well, that's

11 very dramatic, and it's very unfortunate. I'm really

12 sorry.

13          MR. BATINOVICH: And expensive.

14          MS. DUMAS: And very expensive -- well, that's,

15 you know, it's a waste; it's a complete waste. That's what

16 is upsetting to hear; it's a waste of money, and the

17 bankruptcy law is designed to prevent those kinds of things

18 from happening, and it just -- the system failed,

19 obviously. So --

20          MR. BATINOVICH: I think even a bigger travesty is

21 that we tried to negotiate with the landlord which, you

22 know they could have given us 30 days.

23          MS. DUMAS: All right. Well, I'm sure as I said

24 I'll have specific questions for you, and I guess you'll

25 know a lot more where this case is going in January.

1  You'll be moved into a new facility and hopefully will have

2  gotten back, you know, back up and running.  But in the

3  meantime, we have at least one creditor present.  Can you

4  please state your name for the record?

5          MS. MARCAL: Christine Marcal, bankruptcy

6  specialist for the Internal Revenue.

7          MS. DUMAS: Okay.

8          MS. MARCAL: Allow me to give you my card.

9          MS. DUMAS: Thank you.

10          MS. MARCAL: I don't know if you would like me to

11  ask questions now or --

12          MS. DUMAS: No, go ahead.  Absolutely.  Go ahead.

13          MS. MARCAL: And so what kind of business did you

14  say it was, a semiconductor --

15          MR. BATINOVICH: Semiconductor manufacturing,

16  yeah.

17          MS. MARCAL: Okay.  So what do you manufacture?

18          MR. BATINOVICH: Various components that go into

19  different systems, whether it's a medical hearing aid,

20  heart monitors, or satellites or air planes.  I don't

21  always know the total intent especially when it comes to

22  the government and military.

23          MS. MARCAL: Okay.  So this is all for government

24  and military --

25          MR. BATINOVICH: Not necessarily all, but a

1  good -- it's a mixture.

2          MS. MARCAL: A mixture.  Okay.  And when did you

3  start your business?

4          MR. BATINOVICH: Actually, the company was

5  established in 1993 and then we took it public in '96, sold

6  it to a Taiwanese operation in '97, and IPAC purchased the

7  operation in -- the end of 2003, 2004.

8          MR. HEALY: This company, this corporation, IPAC,

9  was formed in what, '03 I think, correct?

10          MR. BATINOVICH: 2003.  IPAC was -- but it was

11  also IPAC before Integrated Packaging Assembly Corporation,

12  a Delaware corporation, and then we incorporated in 20003

13  in California --

14          MS. MARCAL: Okay.  So you've had it since 2003.

15          MR. BATINOVICH: The end of 2003, yeah.

16          MS. MARCAL: The end of 2003.

17          MR. BATINOVICH: Correct.

18          MR. HEALY: August or September is when they

19  incorporated and IPAC --

20          MR. BATINOVICH: In this State starts again.

21          MR. HEALY: Right.  Or this corporation starts

22  operating.

23          MS. MARCAL: So you have a lot of employees?

24          MR. BATINOVICH: We have about 55, 60 employees.

25          MS. MARCAL: Roughly, how much are their wages?

1          MR. BATINOVICH: They are in the 30 plus thousand

2     a year.

3          MS. DUMAS: So what's your monthly payroll, for

4     example?

5          MR. BATINOVICH: Well, it's close to 200,000, in

6     that neighborhood.

7          MS. MARCAL: Thirty thousand a year?  And

8     200,000 -- so how often do you pay them?

9          MR. BATIOVICH: Bimonthly.

10          MS. MARCAL: Bimonthly.  Okay.  Are you required

11     to withhold income, FICA?

12          MR. BATINOVICH: Of course.  We outsource all

13     that.  All our financial and accounting is outsourced and

14     we have Montgomery Professional that handles that for us.

15     And ADP automatically handles the payroll.  So yes, it's

16     all done.

17          MS. MARCAL: Okay.  Under the social security --

18     under the ID number that's listed on the docket, there's

19     some unfiled returns.  Actually the last return that we

20     show filed was for 2005.

21          MR. BATINOVICH: That is absolutely correct

22     because they just finished 2006.  I just signed it last

23     week.

24          MS. MARCAL: Okay.

25          MR. BATINOVICH: It was Montgomery's own mistake.

1  They didn't file it on time.

2          MS. MARCAL: So --

3          MR. HEALY: Just the Federal return or --

4          MR. BATINOVICH: No, both.

5          MR. HEALY: And they're going to file it?

6          MR. BATINOVICH: Yes.  I just signed it.

7          MS. MARCAL: So it's in the process --

8          MR. BATINOVICH: No, I just signed it.  Yeah, so

9  it's in the process of being done.

10          MS. DUMAS: Are we talking the Federal and State

11 tax returns now?

12          MR. BATINOVICH: Yes.

13          MS. DUMAS: Just for clarification.

14          MR. BATINOVICH: Yes.

15          MS. DUMAS: Okay.

16          MR. BATINOVICH: That is correct.

17          MS. MARCAL: Which returns did you sign?

18          MR. BATINOVICH: Both.

19          MR. HEALY: No, she's talking --

20          MS. MARCAL: No, I'm referring to -- did you sign

21 the 1120 for the corporation or did you sign --

22          MR. BATINOVICH: I have no idea what -- I don't

23 know the numbers.

24          MS. MARCAL: Okay.  You don't know the tax

25 returns --

1           MR. BATINOVICH: I don't.

2           MS. MARCAL: Okay.  But you just know it's for

3  2006.

4           MR. BATINOVICH: Yes.

5           MS. MARCAL: So you probably don't recall if there

6  was a balance due or anything else.

7           MR. BATINOVICH: I don't.

8           MS. MARCAL: Okay.  Do you think that Montgomery

9  Professional submitted it to the service center?

10          MR. BATINOVICH: Not yet.  Because as I said, I

11 just signed it and the papers are going back and forth

12 being moved from the old facility to the new facility, so

13 it's somewhere in that transition.

14          MS. MARCAL: Okay.  If possible you can send it to

15 me, and I'll process it.

16          MR. BATINOVICH: Okay.

17          MR. HEALY: Thank you.

18          MS. MARCAL: And that way I can amend the claim.

19 Is it just for 2006 because -- well, 2007 isn't over yet.

20 Okay.  I'd appreciate copies of the original returns, and

21 I'll process it, if not copies.

22          MR. BATINOVICH: Right.  Would it be okay if I

23 also give your information to the Montgomery people so they

24 can directly send it or --

25          MS. MARCAL: Yes.

1          MR. BATINOVICH: Okay.

2          MS. MARCAL: That's fine.

3          MR. BATINOVICH: I don't want to give your number

4 or card unless I get authorization.

5          MR. HEALY: But you spoke to the controller

6 yesterday.

7          MR. BATINOVICH: Yeah, Mark.

8          MR. HEALY: He's the new controller, so that

9 means --

10         MS. MARCAL: Basically then, my question was on

11 the unfiled returns, and --

12         MS. DUMAS: When you say "returns," plural, is

13 that more than one return that's --

14         MS. MARCAL: Yes.  The question would be the 1120

15 return, the 940 return, and 944 return.

16         MR. HEALY: Those are particular forms.

17         MS. MARCAL: Yes.  For the year 2006.

18         MR. HEALY: For the year 2006.

19         MS. DUMAS: But that's all part of the 2006 tax

20 return.  Okay.

21         MR. HEALY: I just spoke to the new controller at

22 Montgomery yesterday.  He had nothing to do with the

23 bankruptcy and wanted to know what he should do or

24 shouldn't -- I'm not sure of his name -- what to do or not

25 to do, but I'll communicate to him that he needs to get

1  this stuff to you.

2          MS. MARCAL: I'd appreciate it.

3          MR. HEALY: Okay. We'll take care of it.

4          MS. MARCAL: Just for the time that he's in

5  bankruptcy, just for the 2006. When 2007 is owed -- when

6  it's time to file the 2007, the same tax forms, you can

7  submit those to me as well. After that, you can send it to

8  the service center as usual.

9          MR. BATINOVICH: Okay.

10         MS. DUMAS: All right. Anything else?

11         MS. MARCAL: That would be it. Thank you.

12         MS. DUMAS: That's it for you? Okay. Gentlemen?

13         All right. So we will see you in the new year,

14  January 9th, 2008 at 1:30 p.m. Good luck with the move.

15         MR. BATINOVICH: Thank you.

16      (Whereupon, the proceedings are concluded.)

17

18

19

20

21

22

23

24

25

1

2

3

4

5                       CERTIFICATE OF TRANSCRIBER

6

7          I certify that the foregoing is a correct

8 transcript from the digital sound recording of the

9 proceedings in the above-entitled matter.

10

11 DATED: February 28, 2008

12

13                     By:   /s/ Jo McCall

14

15

16

17

18

19

20

21

22

23

24

25